1    ISMAIL J. RAMSEY (CABN 189820)
     United States Attorney
2
     MARTHA BOERSCH (CABN 126569)
3    Chief, Criminal Division

4    NOAH STERN (CABN 297476)
     MAYA KARWANDE (CABN 295554)
5    Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         FAX: (415) 436-7234
8        Noah.Stern@usdoj.gov
         Maya.Karwande@usdoj.gov
9
     Attorneys for United States of America
10
                          UNITED STATES DISTRICT COURT
11
                       NORTHERN DISTRICT OF CALIFORNIA
12
                            SAN FRANCISCO DIVISION
13

14   UNITED STATES OF AMERICA,              )   **CASE NO. 21-00164 CRB**
                                            )
15              Plaintiff,                  )   **UNITED STATES' MOTION TO ORDER**
                                            )   **DEFENDANT DETAINED**
16        v.                                )
                                            )   Judge: Hon. Sallie Kim
17   DOUGLAS JAE WOO KIM,                   )
                                            )
18              Defendant.                  )
                                            )
19   _____)

20

21

22

23

24

25

26

27

28

US MOTION FOR DETENTION                    i
21-00164 CRB

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ....................................................................................................................1

II.    RELEVANT BACKGROUND ...............................................................................................4

    A.    The Charged Offenses...................................................................................................4

    B.    Kim's Initial Appearance and Release on Bond ...........................................................6

    C.    The Indictments and Kim's Crime Post-Dating the Complaint....................................6

    D.    Kim's New Fraud Scheme ............................................................................................7

II.    LEGAL STANDARD............................................................................................................20

III.    ARGUMENT .........................................................................................................................21

    A.    There is Probable Cause that Kim Committed a New Federal, State, or Local
        Offense.......................................................................................................................22

    B.    Kim is a Danger to the Community, is Unlikely to Comply with Conditions of
        Release, and Must be Detained...................................................................................23

IV.    CONCLUSION......................................................................................................................24

PLEASE TAKE NOTICE that on April 22, at 11:30 a.m., or as soon thereafter as the matter may be heard before the Honorable Sallie Kim, Magistrate Judge of the District Court for the Northern District of California, the United States hereby moves, pursuant to 18 U.S.C. § 3148(b), for an order revoking the release of Douglas Jae Woo Kim, the defendant in the above-captioned matter; remanding Kim to the custody of the United States Marshal's Service pending trial on the counts in the Superseding Indictment (currently scheduled for June 3, 2024); and forfeiting the $150,000 unsecured bond set as condition of his release on July 15, 2020.  Dkt. Nos. 4 & 6.

## I.    INTRODUCTION

Kim is charged in the Superseding Indictment with defrauding numerous victims, telling myriad lies to obtain loans that he did not repay.[1]  At a high level, Kim's scheme involved portraying himself as a sophisticated cryptocurrency trader who needed liquidity in the form of purportedly risk-free loans, when Kim was actually using the loans to bet on sports or pay back earlier lenders.  Kim's fraud scheme spanned a significant period of time, beginning no later than October 2017, when Kim was 24 years old, continuing through the time he was originally charged by complaint in July 2020, and through at least October 2020, the date of the most recent criminal conduct charged in the Superseding Indictment.  Kim was released on a $150,000 unsecured bond in the pending criminal case and, although the bond did not require him to be supervised by pretrial services, it did require him not to commit another federal, state, or local crime, among other conditions.

The government was recently notified, in January 2024, that in 2023, Kim approached new victims who were unaware of his pending federal charges and solicited loans from them that he failed to repay.  The government subsequently obtained documents from two of these individuals as well as account records from several of Kim's financial accounts.  The information and documents obtained by the government revealed that Kim has engaged in a new, but similar fraud scheme to the scheme charged in the Superseding Indictment in violation of federal law and the terms of his bond.

Kim's new conduct is egregious.  Kim, knowing that one of his new victims (referred to herein as Victim 2) was financially vulnerable with significant medical expenses, proceeded to bilk Victim 2

---

[1] Kim ultimately settled civil claims with some of the victims through which victims received some of their funds back.

out of as much cash and cryptocurrency as he could.  Kim told Victim 2 lie after lie, portraying himself as a savvy traditional investor who was unfamiliar with cryptocurrency but could personally guarantee cryptocurrency loans Victim 2 provided to his "friend."  Kim's "friend" almost certainly did not exist: the loans took generally the same form that Kim directly offered his cryptocurrency lenders in the charged scheme and at least some of the cryptocurrency Victim 2 provided was directly transferred to one of the same offshore gambling websites Kim used in the charged scheme to bet on sports.  Kim also applied pressure to convince Victim 2—who expressed aversion to risk due to his medical issues and expenses—to provide loans over Victim 2's initial objections, applying time pressure to Victim 2's decisions, increasing the payout of the loans to make them difficult to resist, and telling Victim 2 he was offering him free money.  When Victim 2 told Kim that he would not provide additional loans until the initial cash loans he provided were paid back, Kim lied repeatedly about the status of the repayment. Kim claimed he received wire transfers that did not exist, claimed that he had initiated wires and transfers that he had not, and blamed the limitations of peer-to-peer payment applications and his bank for his failure to return Victim 2's cash when, in reality, Kim appears to have simply not had the funds. Through his lies, Kim convinced Victim 2 to extend cryptocurrency loans of 28 ether and 0.8 bitcoin, worth over $50,000, despite Kim's failure to repay U.S. currency loans on time.  Kim transferred the 0.8 bitcoin to one of the same crypto gambling sites Kim used in his initial scheme and failed to repay Victim 2 the bitcoin or 20 of the ether.  As the loans became more and more overdue, Kim continued to invent excuses for his failure to repay the loans while shamelessly requesting that Victim 2 provide additional loans at the same time Victim 2 was telling Kim that he needed to be repaid to pay for medical expenses.[2]

Despite being well past due on his loan obligations to Victim 2, Kim began soliciting loans from Victim 3 in November 2023.  Unlike Kim's discussions with Victim 2, in which Kim pretended to have limited knowledge of crypto, Kim presented himself to Victim 3 as a savvy crypto trader.  Kim said he wanted a loan to pursue multiple cryptocurrency trading strategies, including investing in ATOR, a token linked to the Tor privacy browser.  Victim 3 loaned Kim $50,000 in U.S. currency.  Kim then

---

[2] As described in more detail below, Kim and Victim 2 ultimately entered into a settlement agreement pursuant to which Kim agreed to pay Victim 2 U.S. currency.

pretended he used the loan to invest in ATOR, claiming the investment increased over 20% in the days after the loan was received.  Kim's representations were false.  In reality, Kim used the loan primarily to purchase bitcoin, which he sent to Fairlay, presumably to bet on sports, as well as engage in numerous other transactions that appear unrelated to an investment in ATOR and may have been to pay back other prior lenders.  Kim then solicited additional loans from Victim 3, using some of the same tricks that he used on Victim 2—e.g., placing time pressure on the offers and sweetening the offered return to make the offers too good to refuse.  Kim also provided Victim 3 various false explanations for how he would use the funds.  Victim 3 provided Kim two additional loans, totaling $70,000 at the end of November and beginning of December 2023.  Shortly after receiving the first of these loans, Kim was able to repay Victim 2 the remainder of the cash that Kim owed him.  Prior to Victim 3 sending the last loan to Kim, Kim sent Victim 3 a forged screenshot purporting to show Kim's repayment of the second loan via a wire from his bank account.  In reality, Kim had initiated no such transfer, and Kim's bank account balances were far less than what Kim had claimed he had transferred.  Kim failed to repay the loans on time and none of the loans, $120,000 in total principal, had been repaid as of the last time the government spoke with Victim 3.

Kim has also taken action to conceal his new fraud scheme from the government.  Kim engaged Victim 2 in settlement discussions after Victim 2 began speaking out to Kim's friends and Victim 2's friend messaged Kim's brother, telling him that Kim's actions had been reported to the SEC.  Before providing a draft settlement agreement, Kim's counsel requested that Victim 2 confirm that he had not notified the SEC, FBI, or other named investigative entities.  Only then did Kim's counsel provide a draft settlement agreement.  The draft agreement contained language stating that Victim 2's representation that he had not disclosed Kim's conduct to the government a material term of the agreement.  The proposed agreement also contained a confidentiality and liquidated damages provision that prevented Victim 2 from discussing the loans.[3]  Tellingly, Kim proposed liquidated damages of $50,000 for breach of the confidentiality provision, the entire amount of the settlement being

---

[3] The agreement stated that Victim 2 could make disclosures required by law, but also contained language stating that such disclosures could be made only after seven days prior notice to Kim's counsel.

proposed—suggesting that Kim's primary motivation for the settlement was obtaining Victim 2's silence.  That amount was ultimately negotiated down to $20,000.  Kim's counsel also insisted that the settlement agreement include numerous "whereas" clauses that appear designed to absolve Kim of guilt for his conduct with Victim 2, including a clause requiring Victim 2 to "represent and warrant that he does not believe Douglas Kim intended to defraud him."  Kim's counsel insisted on this provision even after Victim 2 told him in an email that he did not know whether Kim intended to defraud him.  It appears likely that Kim had significant leverage in these settlement negotiations given Victim 2's need for money to pay for medical expenses, and Kim's efforts to use that leverage to silence Victim 2 and attempt to lock him in as a favorable witness is troublesome to say the least.

Because there is probable cause that Kim has committed new federal wire fraud offenses, there is a presumption that no condition or combination of conditions of release can adequately assure Kim's appearance and the safety of the community.  The scope and length of Kim's frauds, along with his complete disregard for the vulnerability of his victims confirms by clear and convincing evidence that Kim poses an economic danger to the community and that he is unlikely to abide by his conditions of release.  Therefore, pursuant to 18 U.S.C. § 3148(b), the United States moves to revoke Kim's pre-trial release conditions; order that he be detained pending trial (which is currently scheduled for June 3, 2024); and forfeit his $150,000 unsecured bond

## II.    RELEVANT BACKGROUND

### A.    The Charged Offenses

Beginning no later than October 2017, Kim commenced a scheme to defraud at least 10 victims of money or cryptocurrency.  Dkt. No. 51 (Superseding Indictment ("SI")) ¶ 17.  Kim made numerous false statements to these victims to trick them into providing Kim loans of cryptocurrency or U.S. dollars, many of which Kim did not pay back.  Kim represented to victims that he would trade or invest cryptocurrency provided by them to make a profit, and by concealing the fact that he used the funds he obtained to gamble on online platforms or pay back others who had previously loaned Kim cryptocurrency or U.S. dollars.  *Id.*  Kim made it appear, falsely, that he was a legitimate cryptocurrency trader seeking short term liquidity for cryptocurrency trading or other legitimate business purposes.  *Id.* ¶ 18.  As part of the scheme, Kim told victims that the loans carried no risk or very low risk and he

1    possessed sufficient funds to guarantee the loans, when in fact he owed significant debts to other victims

2    and he was using the loans he received to gamble. *Id.* ¶¶ 19-20. At various times throughout the

3    scheme, Kim used money or cryptocurrency he obtained from victims who had previously made

4    investments in a manner that was consistent with a classic Ponzi scheme. *Id.* ¶ 20. Examples of some

5    of Kim's conduct during the scheme are provided in the following paragraphs.

6       In October 2017, Kim told a victim that he was looking for BTC investors interested in making

7    short term loans for a "fairly modest operation where we are making a profit between peer-to-peer

8    network and exchange transaction fees." Dkt. 1 ("Compl.") ¶ 14. Kim told the victim that he had

9    approximately $300,000 to $400,000 in financial holdings. *Id.* ¶ 15. Kim requested a loan of 10 BTC

10   and he said he would repay 11 BTC by a date that was approximately three weeks away. *Id.* The victim

11   sent 10 BTC (worth between approximately $55,000 and $59,000 at the time) to an address provided by

12   Kim. *Id.* ¶ 16. Three days later, Kim transferred five of the bitcoins to Nitrogen Sports, a

13   cryptocurrency gambling site outside of the United States. *Id.* ¶ 17.

14       The person who provided the loan discussed in the paragraph above introduced Kim to another

15   victim. *Id.* ¶ 18. In January 2018, that victim loaned Kim 270 ether (worth approximately between

16   $200,000 and $210,000) pursuant to a loan agreement that required Kim to repay the principal and 17%

17   by March 1, 2018. *Id.* ¶ 19. The same day the victim sent the ether, Kim used his Bittrex account to

18   exchange 170 ether for 9.56 bitcoin, of which Kim immediately sent 4.5 to Nitrogen Sports, and then

19   sent another 5 a few days later. *Id.* ¶¶ 20 & 21. This victim loaned 270 additional ether to Kim later in

20   January, which Kim again exchanged into bitcoin on his Bittrex account and then transferred to Nitrogen

21   Sports. *Id.* ¶ 22.

22       The victims described above made other loans that followed a similar pattern. *Id.* ¶¶ 23-25. By

23   mid-2019, in all, these victims, and their associates, loaned Kim 123 bitcoin, 91 of which had not been

24   repaid, and 15,252 ether, none of which had been repaid. *Id.* ¶ 30. The victims would not have loaned

25   the cryptocurrency to Kim if he they had known he planned to use it for gambling. *Id.* ¶ 31.

26       In June 2019, Kim asked another victim if they were willing to be a "liquidity provider to DK

27   capital for 1 month for 5%?" *Id.* ¶ 32. Kim said he would personally guarantee the loan and there was

28   "[n]o risk besides me dying." *Id.* ¶ 33. Kim said that he would carry the risk and "guarantee out of my

assets." *Id.*  Slightly over a week later, Kim asked the victim if he could send the money within the next hour.  *Id.* ¶ 35.  The victim wired $30,000 to Kim, and after Kim received another $30,000 wire, he transferred $59,000 to his account that the cryptocurrency exchange Kraken.  *Id.* ¶¶ 36-38.  Kim then purchased bitcoin with those funds and transferred the bitcoin to his account at Fairlay, another offshore cryptocurrency gambling website.  *Id.*  Kim failed to repay the loan until May 2020, making numerous excuses for his failure to repay the loan.  *Id.* ¶¶ 39-42.  This victim also would not have loaned Kim money if he knew that Kim was going to use the money to gamble.  *Id.*

In Kim's original scheme, he repeatedly lied about his assets and financial position, including sending forged screenshots of account balances.  The government also obtained records from one of the cryptocurrency gambling sites that he used, Fairlay, which showed that Kim used the money he sent to Fairlay almost exclusively to bet on sports.  *See* Declaration of FBI Special Agent Jennifer Barnard in Support of United States' Motion for Detention ("Barnard Decl.") ¶ 20.

On July 9, 2020, a federal criminal complaint was authorized charging Kim with wire fraud in connection with the three victims described above.

### B.    Kim's Initial Appearance and Release on Bond

On July 15, 2020, Kim appeared via videoconference before Hon. Sallie Kim, United States Magistrate Judge for an initial appearance on the Complaint.  Dkt. No. 4.  At the hearing, the Court imposed an unsecured $150,000 bond setting forth conditions of release.  Dkt. No. 6.  The bond did not require Kim to submit to the supervision of pretrial services but did include other standard conditions of release, including that he must not "commit any federal, state, or local crime."  *Id.*  At the hearing, Kim consented to the Court signing the bond on his behalf.  *Id.*

### C.    The Indictments and Kim's Crime Post-Dating the Complaint

On April 20, 2021, a federal grand jury returned an Indictment charging Kim with a single count of wire fraud in violation of 18 U.S.C. § 1343.  On June 8, 2022, a federal grand jury returned a superseding indictment charging Kim with a six counts of wire fraud, eight counts of international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A), and three counts of money laundering, in violation of 18 U.S.C. § 1957.  The grand jury found probable cause that, as late as October 25, 2020, three months after Kim's initial appearance, Kim continued to launder funds by transferring funds

1  fraudulently obtained from a victim to an offshore cryptocurrency gambling website.  Dkt. No. 51,

2  Count 14.

3        **D.    Kim's New Fraud Scheme**

4        In the summer of 2023, Kim solicited loans from two individuals that he worked with at a

5  manufacturing company in Southern California, who are referred to herein as Victim 1 and Individual 4.

6  Barnard Decl. ¶¶ 5-10.  Kim told Victim 1 that he had a finance background and was in the business of

7  liquidating non-fungible token ("NFT" collections)—i.e., purchasing the collections at a discount and

8  selling the NFT's individually at full price.  *Id.* ¶ 5.  Kim told Victim 1 that he needed additional capital

9  to fund this activity, sometimes saying he needed a specific additional amount to fund a purchase.  *Id.*

10  Victim 1 loaned Kim approximately $30,000 in cash between approximately June and October 2023.  *Id.*

11  ¶ 6.  The loans were similar to those Kim solicited in the charged scheme—short term loans at high

12  interest rates.  *Id.* ¶ 9 & n.2.  Kim paid back the earlier loans, but he failed to pay back $14,000 that

13  Victim 1 loaned Kim in October 2023.  *Id.* ¶¶ 8-9.  Kim claimed he could not pay back the loans, which

14  were past due by the end of October, because his family had blocked him from withdrawing money from

15  his accounts.  *Id.* ¶ 9.  As of January 2024, when the FBI last spoke with Victim 1, Kim had not repaid

16  the $14,000 principal or any interest or penalties on that amount.[4]  *Id.*

17        Individual 4 also loaned Kim money in the Summer of 2023 and, at least at first, Kim paid

18  Individual 4 back with interest.  *Id.* ¶ 43.  At approximately the beginning of September 2023, Individual

19  4 introduced Kim to his close friend, who will be referred to herein as Victim 2.  *Id.*  Victim 2 had

20  previously had an accident in which he suffered a brain injury that left him partially paralyzed.  *Id.*  He

21  was disabled, unemployed, and had substantial medical expenses.  *Id.*  Individual 4 thought that Kim

22  could help improve Victim 2's difficult financial position, and Individual 4 introduced Kim to Victim 2.

23  *Id.*  Victim 2's understanding was that Kim bought and sold traditional stocks and options, and that he

24  was also engaged in buying and selling tickets.  *Id.*

25

26

27        _____

28        [4] Victim 1 did not respond to the FBI's request for documents; however, the government believes that the information and documents FBI obtained from other individuals indirectly corroborates what Victim 1 told FBI.

### 1.    Kim Defrauds New Victim 2

Victim 2 and Kim communicated by text message.  Barnard Decl. Ex. A.  In early September 2023, Victim 2 extended cash loans to Kim.  Ex. A at 9-13.[5]  At around the same time, Victim 2 and Kim discussed stock trading strategies and Victim 2 told Kim that he mostly had been trading crypto-related stocks, and that he owned cryptocurrency, including Ether.  *Id.* at 11-14.  Kim communicated that he was "not as familiar" with crypto, *id.* at 13, but he had a "buddy" who could help Victim 2 put the crypto "to work," *id.* at 15.  These representations were false—in the charged fraud scheme Kim portrayed himself as a cryptocurrency trader and borrowed cryptocurrency from numerous victims, SI ¶¶ 17-20, during which Kim held accounts at almost every major cryptocurrency exchange.

Kim told Victim 2 he would find out more from his friend about cryptocurrency opportunities and then told Victim 2 that his friend would pay 5%-10% interest per month on crypto that Victim 2 loaned.  *Id.* at 16.  Kim said that his friend would guarantee the loan and that Kim would also personally guarantee the loan.  *Id.*

In between discussing the terms of a loan, Kim asked Victim 2 about his injury and Victim 2 told Kim that he was in full-time therapy, and he was nowhere close to back to 100%.  *Id.* at 17.  Victim 2 told Kim that he did not want to "mess with much risk" and asked what Kim's friend did with the crypto. *Id.* at 16.  Kim said his friend "got lucky w some shitcoins" but was "now . . . less random/risk forward" and "[m]ost recently he told me he did some small margin nft stuff."  *Id.*

On September 8, Kim said his friend would "do 11 [ETH] back for 10 [ETH] on 10/08 guaranteed."  *Id.* at 18-19.  Victim 2 said that he wanted to wait until Kim repaid the outstanding cash loans before exposing himself more.  *Id.* at 20.  In response, Kim placed time pressure on the loan, asking Victim 2 if he could send the Eth in the "next hour" and telling Victim 2 he would pay back the first cash loan by that evening at the latest, but he was having difficulty with Apple Pay/Zelle payment limits.  *Id.* at 20-21.  After Kim sweetened the proposed ether loan to a repayment of 11.2 ether, Victim 2 agreed to the terms and sent 10 ether[6] to the public address provided by Kim.  *Id.* at 21, 24.  Kim told

---

[5] Page numbers for Exhibit A refer to the red page numbers at the top of the page.

[6] According to a price chart at coindesk.com, ether was trading at approximately $1,650 per ether on September 7, 2023.  Therefore, 10 ether was worth approximately $16,650.

Victim 2 that his crypto was in good hands and that his friend had already made 0.6 ETH on it, saying that he had got a primary sale of nft "or something," which is why he wanted it so fast. *Id.* at 25.

The next day, on September 9, Kim texted Victim 2 that his buddy asked if he could do 10 more, and he would pay 23 back as early as September 28, which Kim said he would also personally guarantee. *Id.* Victim 2 asked if there was negotiation room to make the deal any sweeter and Kim came back saying his friend offered to return 23.5 on the 20 on October 8. *Id.* at 25-26. Kim said he would guarantee up to 40k and he provided a new ether public address for Victim 2 to send the ether. *Id.* at 26. Victim 2 then sent 10 ether to that address. *Id.* at 27.

On September 11, 2023, Kim said his "bud" was putting together a bigger move and his "last ask" was whether Victim 2 had BTC and whether Victim 2 would consider making another loan. *Id.* at 28. Victim 2 responded that he had 0.8 BTC and 8 ETH available and that Victim 2's friend had additional BTC. *Id.* Victim 2 said he did not need liquidity, and his tolerance issue was trusting Kim's friend, which could change with more information. *Id.* Kim responded that his friends offer was 0.8 BTC for 0.95 BTC paid by October 1, and Kim said he could guarantee that amount as well. *Id.* at 29. Kim again placed time pressure on the loan, saying his friend wanted to start making plays "tonight." *Id.* Kim provided an address for Victim 2 to send the BTC, Victim 2 sent a small amount, which Kim confirmed his friend received, and then Victim 2 sent the remainder of the 0.8 BTC.[7] *Id.* at 30-31. According to FBI's tracing analysis, this bitcoin was then transferred to Fairlay, the offshore gambling site that Kim used extensively to place bets on sports in connection with the charged scheme. Barnard Decl. ¶ 46.

On September 12, 2023, Kim said his friend offered up to 5 BTC at the same rate and that Kim could guarantee 2 BTC more. *Id.* Ex. A at 31-32. Victim 2 told Kim he would ask his friend if he could grab 1 BTC from him. *Id.* at 32. Victim 2 then shared his friend's negative response, noting that they "are both pretty successful career-wise now and I'm currently not in a good spot financially, so I think they're cautious. Probably think I'm reckless in my current situation." *Id.* at 32-33. However, later,

---

[7] According to a price chart at coindesk.com, bitcoin was trading at approximately $28,000 per bitcoin on October 1, 2023. Therefore, the 0.8 bitcoin Victim 2 loaned Kim was worth approximately $22,400 at the time of the loan.

1    Victim 2 said his friend was asking about the terms of the loan.  *Id.* at 34.  Victim 2 and Kim discussed a

2    potential loan, including Victim 2 sending Kim's friend 8 additional ETH.  *Id.* at 38-39.  In that

3    conversation, Kim said, "I don't do crypto really," but Kim said he was thinking he would get into the

4    "crypto game."  *Id.* at 39.  Victim 2 agreed to send 8 additional ETH and Kim provided a public address.

5    *Id.* at 39-40.  In response, Victim 2 asked "this is definitely a friend of yours?  Not an online thing

6    right?"  *Id.* at 40.  Kim responded, "Haha yeah."  *Id.*

7         On September 12, 2023, Kim asked Victim 2 for crypto exchange recommendations and said that

8    he was going to buy 2 BTC to loan to his friend.  *Id.* at 45.  The next day, Victim 2 recommended

9    Coinbase, and Kim responded that he signed up, but the initial limits were really low.  *Id.* at 46.  Later,

10   Kim asked if Victim 2's friends could advance Kim 1 BTC for 1.05, and that he would just send the 1.05

11   from his 2 when Kim was cleared.  *Id.* at 47-53.  Victim 2 appears to have sent Kim screenshots of

12   Victim 2's friends' response.  *Id.* at 53-54.  Although those screenshots are not visible in the copy of the

13   messages Victim 2 provided, it appears that Victim 2's friends called either Kim or Kim's supposed

14   friend a scammer.  *Id.* at 54.  Kim then talked about wanting to buy out Victim 2's position with Kim's

15   friend, saying Kim would pay Victim 2 back his principal and a small amount of profit.  *Id.* at 58-59.

16   Later, Kim said with respect to Crypto "I'm out.  It's too sketchy and I understand now haha.  I get it the

17   way your friends reacted and it sort of made me reflect and realize . . . ."  *Id.* at 61.

18        Pursuant to Kim and Victim 2's agreements, Kim was due to pay Victim 2 $17,100 on

19   September 15, as repayment for the cash loans.  *Id.* at 63.  On September 15, 2023, Kim told Victim 2

20   that a $25,000 inbound wire was headed to Kim and he was waiting for it to settle to make the payment

21   to Victim 2.  *Id.* at 70-71.  Kim's bank records show no such inbound wire.[8]  Barnard Decl. ¶ 47.

22   Instead, the records show that, on September 15, 2023, Kim topped up his Apple Cash balance by

23   $4,200 from a Varo Bank account,[9] which he immediately sent to his Juno account—a platform that

24   offers banking services and also provides the ability to purchase cryptocurrency.  *Id.* ¶ 48.  Kim also

25   received a paycheck of approximately $4,000 into his Juno account.  *Id.*  Kim then purchased bitcoin

26   _____

27        [8] The government not yet received records from this account—however, the government has
     received records from the bank account Kim later claimed he was sending a different purported wire to
     Victim 2 from.

28        [9] This is the account from which the government has not yet received records.

with this cash and sent it to his Fairlay account.  *Id.*  After the weekend, on September 19, 2023, Kim received approximately $9,100 worth of bitcoin in his Juno account and sold it for U.S. currency.  *Id.* ¶ 49.  Kim then initiated a $9,000 Apple Cash transfer to Victim 2.  *Id.*  Kim told Victim 2 that he would send the rest by wire transfer and claimed he had initiated a wire for $8,400.  *Id.* at 76.  Victim 2 said he did not receive it and, for approximately 10 days, Kim pretended to troubleshoot the issue.  *Id.* at 77, 79, 81-84, 86-87, 91, 94, 96, 106, 110, 115-16, 124.  There is no evidence in Kim's financial records that he ever initiated this wire, and he appears to not have had the funds to do so.  Barnard Decl. ¶ 50.

On September 25, 2023, after Victim 2 wrote "I appreciate you trying to get [the cash] to me fast.  I know that's why you did the wire.  Bummed it hasn't worked out."  Ex. A at 86.  Kim told Victim 2 that "[f]or consolation" he would give Victim 2 his "spot on that nft deal . . . so 0.6 [ETH] off 7 in less than 24 hours."  *Id.* at 87.  Kim said that Victim 2 would have to send the 7 ETH by 10 a.m.  *Id.* In discussing the possibility of a loan, Kim told Victim 2 he did not have cash: "I'm 95% invested.  Just 0% in crypto."  *Id.* at 92.  This statement appears to have been false.  Kim's account records show that whenever Kim received cash in either his Huntington bank account or his Juno bank account, he quickly used most of that cash to purchase cryptocurrency in his Juno account.  *See, e.g.*, Barnard Decl. ¶¶ 24, 38.  Kim then transferred most of the cryptocurrency he purchased in his Juno account to public addresses associated with Fairlay.  *Id.*  The government has not identified any accounts in which Kim held traditional securities and his two fidelity accounts contained less than $20 for the relevant time period.  *Id.* ¶ 36.

Victim 2 continued to ask Kim about the cash that was due.  Ex. A at 94.  Kim claimed that he could not do anything about paying Victim 2 the rest of the cash until he got the "wire back" that Kim had previously claimed he had sent to Victim 2.  *Id.*  Kim then asked again for a loan of 7 ETH.  *Id.* at 94-95.  Victim 2 responded again that he wanted to be caught up on the cash portion before he loaned additional crypto.  *Id.* at 95.  Kim responded that it was not his fault about the wire, and he did not want to liquidate his other holdings and argued for Victim 2 to send him the 7 ETH, sweetening the deal to a payback of 7.8 ETH and offering to send Victim 2 his paycheck.  *Id.* at 95-96.  Kim then repeatedly continued to ask Victim 2 to loan him 7 ETH, again sweetening the deal to a payback of 8 ETH.  *Id.* at 96-103.

Victim 2 told Kim that hoped he would get his cash back from Kim the next day, otherwise he had to sell positions. *Id.* at 103. Victim 2 wrote that he had two years of big surgeries coming up which insurance "doesn't touch." *Id.* He said he was expecting to have to pay $50,000 the next day to lock in dates. *Id.* Kim then asked Victim 2 for the loan again, offering to shorten the timeline. *Id.* at 105. Victim 2 said no. *Id.* Kim then asked again, offering an extra "1k" out of his Friday paycheck with a penalty of $32,000. *Id.* Kim said, "Send 7, go to sleep don't even think about it and it'll start coming back before noon." *Id.* Victim 2 said no again. *Id.* at 106. Kim then offered "1.5k out of paycheck final offer." *Id.* Victim 2 responded "It's a definite no for me rn. I gotta get some cash from you tomorrow and figure out my surgery game plan." *Id.* Later, Kim texted again, "My buddy just called me and says total profit 8,5 on 7, if that changes anything, and I'll throw in 1500 in from paycheck." *Id.* at 108. Victim 2 again declined. *Id.* at 108-09.

The next day, Kim claimed he was still waiting on the "reversed" wire. *Id.* at 110. After discussing Victim 2's surgery costs again, Kim again asked about a loan, sweetening the deal again to "7 for 9" ether. *Id.* at 111. On September 26, Kim texted Victim 2 again about a loan of ETH, saying that "He did a round last night and this morning and if we had put in it woulda been around 8.8." *Id.* at 114. Victim 2 again declined. *Id.* at 115. Kim asked again. *Id.* at 115-17. Victim 2 again declined. *Id.* at 117-18.

On September 27, 2023, Kim told Victim 2 he got confirmation "that wire is coming back for sure now." *Id.* at 124. In the ensuring discussion, Victim 2 talked about his injury again, telling Kim that his brain injury made it so he could not "control the left side of [his] body." *Id.* Kim responded later that day, "can get you 11 on 8 eth in next 24 hours if you're feeling a little riskier since your bill is better." *Id.* at 125. On September 28, 2023, Kim then asked "Thoughts on the 8? Make ~5% of your surgery fund today?" *Id.* at 126. Victim 2 said no multiple times. *Id.* at 126-127. Kim made another pitch for a loan. *Id.* at 128. Victim 2 again said no. *Id.* at 129. Kim then offered "12 for 8." *Id.* Victim 2 again declined. *Id.* at 122.

On September 28, 2023, Kim also wrote in regard to cryptocurrency, "I dunno Nothin about this stuff still." *Id.* at 131. On September 29, 2023, Kim paid Victim 2 back $600 via Zelle. *Id.* at 132. Victim 2 asked Kim to try other means to pay the remainder. *Id.* Kim responded that Venmo was

"whack," that Paypal "didn't work," and he could only send $250 on CashApp. *Id.* at 132-33. Victim 2 requested that Kim send him $250 via CashApp and the remainder via wire. *Id.* at 134. Kim tried to send the $250 on CashApp but the transaction failed and then he successfully sent it through Apple Cash. *Id.* at 134-35. Kim also claimed he sent a bank transfer for $7,250 to Victim 2. *Id.* at 136. On September 30, Victim 2 said that he had not received the wire and asked Kim where Kim sent it from. *Id.* at 137. Kim responded, "This neobank thing called Juno that I opened to buy you crypto." *Id.* Kim was lying about transfer; his Juno records show no such transfer or attempted transfer. *See* Barnard Decl. ¶ 51. Later that day, Kim wrote "How's your eth appetite now That cash is on way." Ex. A at 138. Victim 2 responded that nothing had changed. *Id.*

On October 1, Victim 2 asked Kim about the status of the BTC that was due that day. *Id.* at 138. Kim said he had to wait for an "uppity hold." *Id.* On October 3, Victim 2 texted Kim that he hadn't received the transfer, appearing to refer to the wire Kim claimed he had sent. *Id.* at 139. Kim said he got an email "yesterday" that it was "completed." *Id.* Kim was lying. *See* Barnard Decl. ¶ 51. Again, Kim's Juno records show no such wire or attempted wire, and Victim 2 told Kim he had not received the wire. *Id.* On October 5, Kim said that the transfer for $7,250 had completed. Ex. A at 143 Again, Kim's Juno records show no such transfer, *see* Barnard Decl. ¶ 51, and Victim 2 continued to tell Kim that he had not received it. Ex. A. at 144. This continued through most of October, and Kim eventually told Victim 2 that he would give Individual 4 (the mutual friend) the cash to give to Victim 2. *Id.* at 153. On October 24, Kim said he was on track to give Individual 4 the cash, and asked Victim 2 to loan him 6 ETH in exchange for the return of 8 ETH by 10 p.m. on October 27, 2023. *Id.* at 155. Kim said if he was a nanosecond late repaying the loan, he would liquidate 60-70k. *Id.* In response, Victim 2 sent Kim a screenshot of what Victim 2 said was the week's therapy bill that he did not have the money for. *Id.* at 155-56. Kim continued to request a loan of ether. *Id.* at 156. Victim 2 responded that the future quality of his life was dependent on him getting money to keep his therapist. *Id.* at 158. Kim continued to request the loan. *Id.*

For the remainder of October and most of November, Victim 2 continued to request that Kim repay the loans. *Id.* at 158-180. Kim continued to make excuses for nonpayment. *Id.* Finally, on November 29 and 30, 2023, Kim repaid the cash balance via Apple Cash. *Id.* at 180-81; Barnard Decl.

¶¶ 31-33.  As will be described below, Kim appears to have only been able to make this payment after defrauding Victim 3.

Kim still owed Victim 2 21.5 ETH and 0.8 BTC.  Ex. A at 181.  Kim blamed a Coinbase delay for his failure to repay the crypto.  *Id.* at 182.  On December 15, 2023, Victim 2 asked Kim to immediately send cash equivalent to 1.5 Eth so that he could pay his therapy bill.  *Id.* at 187.  Kim responded, "Can't I'm tapped."  *Id.*  Kim then stopped responding to Victim 2's text messages until December 29, 2023.  *Id.* at 187-183.  On December 29, 2023, Victim 2 sent an Instagram message to at least some of Kim's Instagram followers, stating that Kim had failed to repay Victim 2.  Barnard Decl. ¶ 54.  One of Victim 2's friends, referred to herein as Individual 5, also texted Kim's brother, telling him that he had notified the SEC.  *Id.*  On December 29, 2023, Kim texted Victim 2 and told Victim 2 to contact his lawyer.  *Id.*

Victim 2 then began communicating with Kim's retained criminal defense attorney in this case.  On January 2, 2024, presumably at the request of Kim's counsel, Victim 2 wrote, "I, [Victim 2], have not filed a complaint about the Douglas Kim matter to the SEC.  Nor has [Individual 5]."  Kim's counsel responded, "I assume that goes for any other government agency, such as FINCEN, CFTC, FBI, etc."  *Id.* ¶ 55.  Victim 2 replied, "Correct."  *Id.*

On January 4, 2024, Kim's counsel sent Victim 2 a draft settlement agreement.  Barnard Decl. Ex. C.  The draft settlement agreement included "WHEREAS" clauses, including "Kim did not make any representations as to the use he intended to make of the loaned funds," "neither [Victim 2] nor Douglas Kim agreed to any restrictions on the use of the proceeds of the Loans," and Victim 2 "represents and warrants that he does not believe Douglas Kim intended to defraud him."  Barnard Decl. Ex. B.  The draft settlement agreement also included a "Confidentiality and Liquidated Damages" clause requiring Victim 2 to agree not to disclose the settlement or "the discussions, negotiations, or communications, whether verbal or in writing, which occurred concerning the Loans, [and] all matters related to the Loans."  *Id.* at 3-4.  As part of this clause Victim 2 was required to "represent as a material term" of the settlement agreement that neither he nor his friend, Individual 4, "has contacted the Securities and Exchange Commission (SEC), or any other agency, including FINCEN, the CFTC or the FBI, about Douglas Kim as set forth in [Individual 5's] text message to [Kim's brother] on December

30, 2023." *Id.* at 4.  The proposed agreement required Victim 2 to respond to questions about the loans and/or the agreement by saying "nothing other than 'it has been resolved' or similar words to the effect without disclosing any information regarding the terms and conditions of this Agreement, the process leading up to this Agreement, or anything else regarding the Loans." *Id.*  The proposed agreement also contained a liquidated damages provision of $50,000—the entire amount of the proposed settlement— for breach of the confidentiality provision, in addition to attorneys' fees. *Id.*  The proposed confidentiality provision had no exception for the provision of information to law enforcement except that it allowed for a "disclosure required by law or compelled by Court or tribunal" subject to the requirement that notice be provided to Kim's criminal defense attorney seven days in advance of the disclosure. *Id.* at 3-4.

Victim 2 attempted to strike or modify several of these provisions, but Kim's attorney resisted the changes.  Ex. B.  Kim's attorney responded, stating, in part, that "[w]e would like to re-insert the recitations" and that the liquidated damages provision with respect to confidentiality was "essential." *Id.* at 5.  Victim 2 and Kim's attorney continued to negotiate the settlement agreement, including the liquidated damages clause. *Id.*  Victim 2 agreed to add back in some of the WHERAS clauses but told Kim's criminal defense attorney that the last clause, regarding Kim's intent to defraud, "is not acceptable as a material representation.  I really don't know." *Id.* at 4.  Kim's counsel pushed back, and the final settlement agreement included all of the WHEREAS clauses and the confidentiality requirements with a corresponding liquidated damages provision of $20,000.  Barnard Decl. Ex. D.

In mid-January 2024, when Kim finalized a settlement agreement with Victim 2, the approximate value of the cryptocurrency that Victim 2 had loaned Kim that Kim had not returned was approximately $84,000.[10]  The settlement agreement provided for Victim 2 to receive $52,500 U.S. currency.  Ex. D.

### 2.    Kim Defrauds New Victim 3

In November 2023, Victim 3 was introduced to Kim by a mutual friend, who had gone to middle

---

[10] The settlement agreement appears to have been executed on January 15, 2024.  On that date, according to the CoinDesk charts, ether was trading at approximately $2,500 and bitcoin was trading at approximately $42,500.

school with Kim.  Barnard Decl. ¶ 13.  Kim had made a "loan offer" to the mutual friend in an email dated November 13, 2023.  *Id.*  Despite Kim's representation to Victim 2 that he had limited familiarity with crypto, in the email, Kim portrayed himself as having crypto expertise, writing "Web3/Crypto is beginning to enter a bullish cycle" and summarizing certain events occurring in the cryptocurrency space.  *Id.*  Kim's email included a description of ATOR, which Kim described as "a token that is attached to the success and prevalence of Tor, the privacy browser."  *Id.*  The email described the terms of the offer as "$25,000- 50,000 loan, 15% return, 1 month, to freely speculate in the crypto space and attempt to accumulate profits in BTC and/or Ator and build a holding ahead of 2024.  Willing to pay $3,750 - $7,500 on $25,000-$50,000 respectively for the extra liquidity to speculate."  *Id.*  Victim 3's and Kim's mutual friend forwarded the email to Victim 3.  *Id.*

Kim then directly asked Victim 3 for a loan.  *Id.* ¶ 14.  Victim 3, who was unaware or Kim's pending federal criminal charges, understood that Kim was going to use the money to invest in ATOR, as well as potentially other cryptocurrencies.  *Id.*  Victim 3's impression was Kim was very knowledgeable and he was going to manage the position and trade in and out.  *Id.*  Kim told Victim 3 he would stop if anything moved too far.  *Id.*  Victim 3 told Kim he would think about it and asked Kim to send a contract.  *Id.*

On November 15, 2023, Kim wrote Victim 3 a text message, "As mentioned, down to flex up on rate or down on term if we go fast cause I think it could really keep pumping through weekend (if we had initiated yesterday we all would be in the money alrdy haha)," and "If you like it, down to increase it to 20% 4 weeks if we can get in the market tmr."  *Id.* ¶ 15.  Kim advised, "My plan is to stop out, I have to decide exactly how little profit i am willing to take (have been watching and putting in since 0.78, so have a healthy safety of margin), but in the case this somehow went to 0 before I could catch it, I could still cover the loan and not be in a terrible spot."  *Id.*

On November 16, 2023, Kim wrote "I think I'll make 5-10k net on your 60 but also doing in the case it rly blows up and make another 15-20k.  But again, either way you get 60k dec 14 regardless of my performance / gains or losses."  *Id.* ¶ 16.  Later Kim wrote, in part, "it spiked to 2.15 and the interday has constantly been volatile but always ends up up. So I would love to get in today while it's still below $2.00 if you have time to go over this in the next few hours."  *Id.*  Kim advised "Anyways, wire cut off

is normally 4pm or so, and don't mean to push but def moves fast – if we had gone in Tuesday for example we'd be up 25% or so already and I like that is sub $2 still." *Id.*  A historical price chart for ATOR available on binance.com shows price movements generally consistent with what Kim described above.[11]

Victim 3 said Kim told him if Kim lost money, he would repay the loan out of his own assets and equity. *Id.* ¶ 17.  Victim 3 said that Kim added a $1,000 origination fee if Victim 3 wired the money before 4 p.m.  *Id.*  Victim 3 agreed to extend the loan Kim $50,000 and the two executed a promissory note requiring Kim to repay $60,000 by December 14, 2023, and Victim 3 wired the money to Kim's bank account.  *Id.* ¶ 18.

Kim confirmed receipt of the money and told Victim 3 that the market was pulling back, and he was "gonna get in at a nice price." *Id.* ¶ 19.  On November 18, 2023, Kim wrote "Got a great entrance point" and "1.53." *Id.* ¶ 20.  Victim 3 responded with "Okay …gotta hope the trend continues now" and Kim's response was "Haha yeah, or mange it which I will"; "Not trying to day trade it but monitoring." *Id.*  Later, Kim wrote, "up 12% or so for now.." and then "26% rn." *Id.* ¶ 21.  On November 19, 2023, Kim wrote "I stopped out and captured 17%, looking to get back in." *Id.*  On November 20, Kim wrote "1.61 re-entry, decent run over night /this am" to which Victim 3 responded "Okay" and "For purposes of our thing, I was hoping that once you have the profit secured along with my interest, just don't lose it haha :)." *Id.*  Kim asked, "Haha what do you mean" and Victim 3 responded "Just mean don't lose it . . . Nothing more than that." *Id.*  Kim responded, "For sure" and "Back up to net 27% or so." *Id.*  Later the same day, Kim texted "Stopped again, at 22% net." *Id.*

According to a price chart for ATOR, ATOR dropped from approximately $1.94 at 4 p.m. on November 18, 2023 to $0.67 at 4 p.m. on November 21.[12]  On November 21, Kim texted Victim 3, stating "So the reason it really tanked is bc of a fundamental change and philosophical differences between the coin stakeholders and the people who run Tor (the privacy browser) so the project has to shift entirely. I am shifting to other strategies generating more btc and looking at other coins," "Up 22% tho."  Barnard Decl. ¶ 21.

---

[11] *See* https://www.binance.com/en/price/airtor-protocol (last visited April 15, 2024).

[12] The price chart at binance.com appears to have only one price data point per day.

Kim, however, was lying about investing the loan he received from Victim 3 in ATOR. Upon receiving the money, Kim attempted to quickly send $25,000 to his Juno Finance account, a company that describes itself as "the easiest way to go from cash to crypto." *Id.* ¶ 23. However, according to Juno's website, ATOR is not supported by Juno.[13] In any event, the $25,000 did not settle Kim's Juno account until November 27, and so as of the date of the text messages on November 21, Kim had done nothing with half of the loan money. Barnard Decl. ¶ 23. Kim engaged in numerous transactions involving the remainder of the loan funds. *Id.* ¶ 24. The bulk of the money, however, about $16,000 was transferred to Juno in a variety of ways, used to purchase bitcoin, and then sent to Fairlay. *Id.* When the $25,000 transfer to Juno finally settled on November 27, 2023, Kim used $20,000 to purchase approximately a half of a bitcoin, which he then immediately sent to Fairlay. *Id.* While the government has not yet obtained Kim's betting records at Fairlay for Kim's most recent conduct,[14] with respect to the charged scheme, the government obtained Fairlay records for Kim's account showing that he almost exclusively used funds in his Fairlay account to bet on sports. *Id.* ¶ 25. Further, while Fairlay's website states it offers an "exchange" to exchange between cryptocurrencies, a recent review of the website shows that ATOR is not one of the tokens that can be exchanged.[15]

In the meantime, Kim began asking Victim 3 for another loan around November 22, 2023. Barnard Decl. ¶ 26. Kim texted Victim 3 saying "Btw – if you want a free $1500, I have 25k sale/transfer I'm being told won't be available till next Monday bc of holiday. I'll give you 26.5 Tuesday (11/28) if you advance me the 25 today :) (so no risk truly but also same guarantees). No worries if not." *Id.* In response Victim 3 texted "Well let's have a first successful stake when I can see the wire back and we make good on the initial investment. Understand that I just met you . . . but have full faith you'll make good on it." *Id.* Kim also told Victim 3 "We are at 63 and change on the 50." *Id.* This was a lie, as the loan was either still in limbo between Kim's bank account and Juno or it had been

---

[13] *See* https://help.juno.finance/en/articles/5598183-which-cryptocurrencies-are-supported-on-juno (last visited April 16, 2024).

[14] The government has obtained some records from Fairlay, but these records do not show bets placed, nor do they appear to show all of the transactions discussed in this motion and corresponding declaration, indicating that Kim may have had accounts at Fairlay that Fairlay has not yet provided.

[15] *See* https://www.fairlay.com/markets/exchange/ (last visited April 16, 2024).

sent to Fairlay.  *See* Barnard Decl. ¶¶ 23-24.

On November 27, 2023, Kim made multiple additional requests for a loan.  *Id.* ¶ 28.  Kim texted he was "basically arbing someone who needs liquidity 10-15% and need an additional 30-50 to get it done."  *Id.*  Kim texted "Again will reiterate this is a one off special need/opportunity for me, hence being generous + paying up since I'm asking for additional before completing first deal."  *Id.*  And "I will expect to make 10-15 on total amount (including what I have already) net of what I'm offering, in an asset I'm trying to accumulate too. I am unable to make any of the profits on this without the additional."  *Id.*

On November 28, 2023, Kim texted Victim 3 about the loan, offering to throw in $1,000 extra.  *Id.* at ¶ 29.  Victim 3 asked if he could get back to Kim the next day.  *Id.*  Kim responded that he would "maybe have to let it go then.  Cause I'd have to get into crypto today."  *Id.*  Victim 3 agreed to lend Kim an additional $30,000 and wired Kim the money.  *Id.* ¶ 30.  According to the executed promissory note, the term of the loan was until December 4, 2023, at a rate of 14% per six days with an origination fee of $5,000.  *Id.*

After receiving the loan, Kim transferred approximately $18,500 to Juno over the next two days, bought bitcoin with half, which he sent to Fairlay.  Barnard Decl. ¶ 31.  Shortly after that Kim began receiving bitcoin in his Juno account and selling it, for approximately $23,000.  *Id.* ¶ 32.  Kim sent a portion of this, $6,650, to Victim 2 via Apple Cash as repayment for Victim 2's past due cash loans.  *Id.* ¶ 33.

On December 4, 2023, the due date for Victim 3's second loan of $30,000, Kim sent a screenshot purporting to show that $39,000 had been successfully sent from Kim's Juno Checking account to Victim 3's bank account.  *Id.* ¶ 34.  Kim appears to have forged the screenshot as his Juno records show no such transfer show that he never had a balance of higher than $25,000 in November and December 2023.  *Id.*

On or about December 4, 2023, Kim asked Victim 3 for another loan.  *Id.* at ¶ 35.  Kim texted "Do you know anyone in it who might want to do a similar quick buck turn around?  I may be able to take the whole dudes portfolio[,]" and " I'd need just 1-2 btc range so 40-80."  *Id.*  Kim wrote, "I'm up healthy, but still not enough for the rest of what he's got[,]" "I haven't engaged yet since I don't have it

1  but he texted me this morning – total earnings pot would be 30-50k[,]" and "Alternatively what's your

2  appetite to buy in and liquidity like now." *Id.*

3      Victim 3 texted Kim he had not received the $39,000. *Id.* ¶ 36.  In response Kim lied, "Spoke to

4  manager says it'll definitely go through, some delays w banking partner." *Id.*  Kim also texted, "I'm

5  also down to sell equities and send entire chunk (39 and new deal) if for some odd reason this doesn't go

6  through[,]" and "If you don't have this wire by Friday I'll have all of it from Fidelity (this and new deal)

7  to you by Monday." *Id.*  This was also a lie as Kim's Fidelity accounts had less than $20 dollars. *Id.*

8  Later Kim texted, "In case you receive or change your mind in the next hour here are below

9  offers/amounts . . . ." *Id.*  Kim lied again, "Can ensure you get 39 and above option by Monday either

10  through current method or via fidelity (sold equities)." *Id.*

11      Victim 3 agreed to loan Kim an additional $40,000 and wired the money on December 4.  *Id.*

12  ¶ 37.  Victim 3 and Kim executed another promissory note, which required repayment of the loan by

13  December 11, 2023, at an interest rate of 30% per seven days.  *Id.*  Victim 3 believed that Kim was

14  going to use the money to purchase a portfolio that was being liquidated and that Kim was going to

15  arbitrage the portfolio.  *Id.*

16      Kim used the proceeds of this third loan in a similar manner to the prior two, transferring much

17  of the money to Juno, buying bitcoin, and sending most of it to Fairlay.  *Id.* ¶ 38.  On December 5, 2023,

18  Victim 3 texted Kim "I imagine the latest tranche has gone well?"  Kim replied, "Yeah baby,"

19  "Everything moving our way."  *Id.* ¶ 39.

20      Kim then failed to pay back the loans, providing numerous excuses for his failure and repeated

21  assurances that he would pay soon.  *Id.* ¶ 40.

22      Victims 1, 2, and 3, all told FBI that they would not have loaned Kim the money had they known

23  that he would use it to gamble or repay prior lenders.

## II.    LEGAL STANDARD

25      Under 18 U.S.C. § 3148(a), a person released under 18 U.S.C. § 3142 and "who has violated a

26  condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for

27  contempt of court."  Under 18 U.S.C. § 3148(b), an attorney for the government "may initiate a

28  proceeding for revocation of an order of release by filing a motion with the district court."  A judicial

1   officer "may issue a warrant for the arrest of a person charged with violating a condition of release." *Id.*

2   "The person shall be brought before a judicial officer in the district in which such person's arrest was

3   ordered for a proceeding." *Id.*  A court must consider, under § 3148(b)(1), whether there exists

4   "probable cause to believe that the person has committed a Federal, State, or local crime while on

5   release," § 3148(b)(1)(A), or "clear and convincing evidence that the person has violated any other

6   condition of release," § 3148(b)(1)(B).  Then,  if either condition is satisfied, the court must determine,

7   under § 3148(b)(2), whether "there is no condition or combination of conditions of release that will

8   assure that the person will not flee or pose a danger to the safety of any other person or the community,"

9   § 3148(b)(2)(A), or whether "the person is unlikely to abide by any condition or combination of

10  conditions of release," § 3148(b)(2)(B).  If the government establishes that there exists probable cause

11  that defendant has committed a crime while on release, "a rebuttable presumption arises that no

12  condition or combination of conditions will assure that the person will not pose a danger to the safety of

13  any other person or the community."  18 U.S.C. § 3148(b).

14          Under 18 U.S.C. § 3142(g) the factors the Court must consider in determining whether there are

15  conditions of release that will reasonably assure the appearance of the defendant and the safety of the

16  community are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence

17  against the defendant; (iii) the history and characteristics of the defendant, including the defendant's

18  character, physical and mental condition, family and community ties, past conduct, history relating to

19  drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well

20  as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature

21  and seriousness of the danger to any person or to the community that would be posed by the defendant's

22  release.  *See* 18 U.S.C. § 3142(g).

23  **III.     ARGUMENT**

24          Kim poses a clear economic danger to the community and there is no combination of conditions

25  that can ensure the safety or the community.  Danger to the community is not limited to physical

26  violence but rather can encompass pecuniary and economic harm, as well.  *See, e.g.*, *United States v.*

27  *Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992); *United States v. Kakkar*, No. 5:13-cr-00736-EJD, 2017

28  WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017).  Kim's egregious new criminal conduct make clear that

1  he is a danger to the community and unwilling or unable to comply with his release conditions.

2  Therefore, the Court should order Kim detained and forfeit his $150,000 unsecured bond.

### A.   There is Probable Cause that Kim Committed a New Federal, State, or Local Offense

As an initial matter, there is probable cause to believe that Kim has committed multiple new crimes. 18 U.S.C. § 1343 makes it a crime to devise or intend to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and then to "transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1349 makes it a crime to attempt to commit wire fraud. California law prohibits fraud in general. *See, e.g.*, Cal. Penal Code. § 532 (prohibiting fraud and false pretenses).

Kim repeatedly committed wire fraud and attempted wire fraud in connection with the loans he obtained from, at a minimum, Victims 2 and 3. Kim repeatedly lied to Victims 2 and 3 in order to trick them into loaning him money. With respect to both of these victims, Kim repeatedly lied about his personal financial condition and ability to repay the loans. Kim lied about what he planned to use the money or cryptocurrency for, and he lied about financial transactions he said he was engaging in, including lying and forging images regarding his efforts and ability to repay the loans. Based on the text messages, Kim's false statements about his financial condition and efforts to repay the loans were clearly important to the victims' decisions to loan additional money to Kim. As Kim's lies became increasingly more brazen, he continued to request loans from his victims, applying more and more pressure and engaging in attempted wire fraud. Moreover, with respect to Victim 2, Kim lied about his experience with cryptocurrency and appears to have invented a "buddy" who would invest Victim 2's money in crypto. Further, everything that Kim said to his new victims was misleading in light of his failure to disclose that he was *under indictment in a pending federal criminal case for defrauding over ten victims in a cryptocurrency loan fraud scheme*. Kim's schemes with respect to Victims 2 and 3 involved multiple interstate wires, including the Fedwire transfers Victim 3 sent to Kim's bank accounts. In short, there is probable cause that Kim has committed numerous new fraud counts.

**B.    Kim is a Danger to the Community, is Unlikely to Comply with Conditions of Release, and Must be Detained**

Because there is probable cause that Kim committed new crimes while on release, there is a rebuttable presumption that there is no combination of conditions that can reasonably ensure Kim's appearance or the safety of the community.  Kim cannot rebut that presumption here and must be detained.  He must also be detained because he has made clear that it is unlikely he will abide his current conditions of release or any additional conditions that the Court imposes.

The nature and circumstances of the instant offense and his conduct while subject to bond conditions make clear that there is nothing that will stop Kim from continuing to tell lies to obtain money or cryptocurrency that he can then send to offshore gambling sites.  The fact that Kim continued to fraudulently obtain loans and send the funds to Fairlay after this case was initially charged by complaint and then renewed his scheme three years after the initial charges were filed while he was subject to a bond issued by the Court, suggests that even a high likelihood of detection and the threat of going to jail cannot deter him from engaging in more fraud.  Further, Kim's total disregard of a vulnerable victim underscore that Kim is motivated to continue his scheme regardless of the circumstances.  The manner in which Kim attempted to take all that he could from victims strongly suggest that there are no conditions that can deter him from continuing to harm members of the community by defrauding them.

The weight of the evidence of the charged scheme also supports detention. Kim defrauded over ten victims in a similar manner, including by sending screenshots of account balances that the government can prove were forged based on reference to the real account documents.  Kim's similar conduct in 2023 underscores the weight of the charged case.

Kim's history and characteristics also support detention.  Kim has now been engaging in fraud schemes for most of the past seven years, with a possible two-and-a-half-year break from October 2020 to summer 2023.  Fraud is the way Kim does business, and he has made clear by engaging in this conduct while federal charges are pending and he is subject to bond conditions, there is nothing this Court can impose short of jail will stop him.

Finally, the economic danger Kim poses to the community is serious.  Kim's fraud schemes have

targeted vulnerable victims, childhood friends, and mutual friends.  Kim has made clear that he feels entitled to steal people's hard-earned assets if he can find a lie that will convince them to part with their money.  Kim's continued release will allow him to engage in new schemes endangering the members of the community who are targeted.  Kim should be detained.

**IV.    CONCLUSION**

For the reasons stated above, the United States requests that the Court order defendant Douglas Jae Woo Kim be detained pending trial.

DATED:        April 16, 2024                    Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


_____/s/_____
NOAH STERN
MAYA KARWANDE
Assistant United States Attorneys